UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EPHRAIM HIZON GARCIA and<br>GANDHIRAJ SANKARALINGAM a/k/a<br>GANDHI RAJ,<br><br>Defendants. | CRIMINAL NO. 18-CR-377-APM |

**GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMORANDUM**

    In his Sentencing Memorandum, Defendant Garcia asks this Court to sentence him to probation and home confinement, notwithstanding the serious nature of his offense and the agreed-upon applicable Sentencing Guidelines range of 97 to 121 months. As justification, he primarily relies on his prior military service, his age (64), and a long list of ailments of unknown (and unexplained) severity. Such a lenient sentence would be unjust and inappropriate in this case, and would not be in keeping with the Section 3553(a) factors. Instead, whatever factors militate in favor of leniency should be accounted for by imposing a term of imprisonment at the low end of the Guidelines range of 97 to 121 months. If the Court is inclined, however, to depart downward, then the Government respectfully suggests a sentence of at least the length recommended by the Probation Office (72 months) is necessary to achieve the purposes of sentencing.

**I.**    **The Defendant Confuses the Contracts at Issue to Erroneously Argue that the Applicable Intended Loss (or Gain) is Less than the Agreed-Upon Amount in the Plea Agreement.**

    The defendant erroneously argues that "the intended loss is significantly lower than what the parties had agreed to in the plea agreement," because the value of the contract at issue was $110,420, and the defendant thus "would have received between $15,450 and $27,605." Dkt. No.

61 (Def. Sentencing Memo.) at 5–6. This is wrong. The defendant is conflating two different contracts: (1) a 2013 contract to replace six HVAC units that the defendant attempted to steer to Gulf Link (which had an estimated value of $110,420), and (2) the 2015 project for a lifecycle replacement of more than 100 HVAC units in Zone 6 of Camp Arifjan (which had an estimated value of over $3 million) and was the subject of the Olive Garden meeting. The only thing in common between these two contracts was the defendant's attempt to improperly influence the procurement process to make sure that Gulf Link got the business for both. Thus, as explained below, the intended loss (or gain) amount is properly calculated based on the latter, $3 million contract that was the subject of the kickbacks conspiracy to which the defendant pleaded guilty.

As the defendant acknowledges, under U.S.S.G. § 2C1.1(b)(2), "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or *to be obtained by a public official or others acting with a public official*, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 . . . corresponding to that amount" (emphasis added). The parties agreed that "for purposes of U.S.S.G. § 2C1.1(b)(2), a reasonable estimate of the value to be obtained by a public official or others acting with a public official is approximately $755,764.39."[1] Dkt. No. 51 (Plea Agreement) at 3. This amount was calculated by multiplying $3,023,058 (the

---

[1] In its Memorandum in Aid of Sentencing, Dkt. No. 59 at 8 n.5, the government mistakenly stated that the $755,764 was "a reasonable estimate of the value to be obtained by [the defendant] through his offense conduct . . . ." More accurately, since the defendant was supposed to split the illicit gains with his co-conspirators, the government should have said that the $755,764 was "a reasonable estimate of the value to be obtained by [the defendant] *and his co-conspirators* through *their* offense conduct." The difference is immaterial to the Guidelines calculation, however, because the defendant is liable for the full amount that he and his co-conspirators intended to obtain from the offense since it is within the scope of their jointly undertaken criminal activity. *See United States v. Mellen*, 89 F. App'x 268, 270 (D.C. Cir. 2004) (explaining that the district court properly attributed to the defendant all of the losses suffered as a result of the conspiracy to defraud) (citing U.S.S.G. § 1B1.3).

estimated value of the Zone 6 lifecycle HVAC contract) by 25%, the high end of the range by which Gulf Link was to inflate its bid under the scheme. The use of the high end of that range was agreed upon by the parties and appropriate. *See United States v. Miller*, 316 F.3d 495, 505 (4th Cir. 2003) (full face value of the amount fraudulently billed was reasonable estimate of what defendant intended to obtain, even assuming the defendant had no "reasonable expectation of receiving the full amount billed," because though the defendant "may not have expected to get it all, he could be presumed to have wanted to.") (internal quotations omitted).[2]

The defendant's argument, then, that the amount the parties agreed to in the plea agreement was somehow incorrectly calculated is simply wrong, and the Court should give it no weight.

## II. The Defendant's Kickbacks Attempt Was Not a One-Time "Lapse in Judgment."

The defendant argues that his attempt to engage in kickbacks was a "one-time momentarily [*sic*] lapse in Judgement." Def. Sentencing Memo. at 2. The evidence indicates otherwise. As discussed in the government's sentencing memo, the defendant had an improper relationship with his co-conspirator, Defendant Sankaralingam, that dated back years, and involved at least one other contract that Garcia attempted to steer to Gulf Link (the aforementioned 2013 contract) as well as dozens of wire transfers, totaling tens of thousands of dollars, that Sankaralingam and others working for Gulf Link sent to Garcia's daughters over the course of about five years. It strains credulity to suggest that the Olive Garden meeting in 2015 was an aberration.

Indeed, the defendant acknowledges his improper conduct with respect to the 2013 contract. *Id.* at 3–4. And in his letter to the Court, the defendant appears to confirm that he

---

[2] Even using the low end of the range which Gulf Link proposed to inflate its bid under the scheme (*i.e.*, 14%), the resulting value to be obtained would be $423,228, which would result in an Offense Level of 28 and a Guidelines Range of 78 to 97 months—well above the defendant's recommended sentence of probation and home confinement.

improperly steered or attempted to steer contracts *on multiple occasions*: "Companies that were duly qualified for certain government contracts were deprived of fair opportunities as a result of bad behavior and poor actions such as mine in this case." Dkt. No. 61-1 at 10. And it bears noting that a few weeks after the 2015 Olive Garden meeting, the defendant followed up with the prime contractor employee and *again* attempted to enlist him in the scheme. These are not the actions of a man who made a one-time "mistake": they are instead the actions of someone who spent years exploiting his official position for his own personal financial gain, only ceasing once he got caught.

**III.     A Sentence of Home Confinement Would Be Unjust.**

A sentence of probation plus home confinement as the defendant advocates would *not* properly reflect the serious nature and circumstances of the offense, would *not* provide just punishment, would *not* afford adequate deterrence (or, indeed, any deterrence), would *not* comport with the Guidelines, and would *not* be consistent with those sentences imposed among similarly-situated defendants. In short, it would fulfill virtually *none* of the 18 U.S.C. § 3553(a) factors.

The only justification the defendant cites for such an extreme departure from the recommended Guidelines range is his military service, age, and health status. To be sure, the defendant's service as an enlistee in the United States Air Force is laudable. But whatever credit the defendant deserves for serving his country must be weighed against the defendant's decision, later in his career, to cheat his country by abusing his position with the U.S. Army. As far as the defendant's age is concerned, he is not a young man, but neither is he elderly. And, though the need for specific deterrence may be reduced in the case of an older defendant, the need for general deterrence is not. Lastly, the Defendant cites a litany of health conditions for which he is receiving VA benefits, Def. Sentencing Memo. at 8, but he has made no representation (nor provided any substantiation) that any of these conditions are seriously debilitating or that the Bureau of Prisons

would be unable to provide adequate treatment. Absent any further justification or explanation of the defendant's present health status, the Court should give this factor minimal weight.

Although the defendant points to a handful of cases in which, under extraordinary circumstances, older defendants with serious health conditions were given non-incarceration sentences, those cases involved defendants who (1) actually proffered evidence of their infirmity in the form of physician testimony and/or letters, *and* (2) were more elderly and had significantly more serious health conditions than the defendant here. *See United States v. Hildebrand*, 152 F.3d 756, 767 (8th Cir. 1998) (70-year-old defendant with "life-threatening health conditions"); *United States v. Barbato*, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002) (81-year-old defendant presented evidence in the form of physician letters describing him as "totally disabled" and in need of "continuous monitoring"); *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (69-year-old defendant with "serious and substantial health problems" put on testimony from his doctors that led the court to speculate that the defendant might very well "die before completing his sentence"). The defendant here is substantially younger than any of these defendants and has presented no evidence of the kind of severe, debilitating health conditions necessary to justify a non-incarceration sentence. As the *Willis* court noted, though a defendant does not need to be at "death's door" to justify a downward departure, "[t]he standard should not amount to a 'get out of jail free' card for defendants of a certain age or with certain conditions." 322 F. Supp. 2d at 83.

For the foregoing reasons and those stated in its sentencing memo, the United States respectfully requests that the Court sentence the defendant to a period of incarceration at the bottom of the advisory Guidelines range of 97 to 121 months and impose a $165,000 fine.[3]

---

[3] The government proposes a $165,000 fine because it is the mid-point of the guidelines fine range the defendant agreed to in his plea agreement, *see* Dkt. No. 51 at 3, and because the defendant has substantial assets (a net worth in excess of $1 million) with which to pay a fine.

-6-

        Respectfully submitted,

        JOSEPH S. BEEMSTERBOER
        Acting Chief
        Criminal Division, Fraud Section

By:   */s/Matthew F. Sullivan*
       Christopher D. Jackson
       Acting Assistant Chief
       Matthew F. Sullivan
       Trial Attorney
       United States Department of Justice
       1400 New York Ave., N.W.
       Washington, D.C. 20005
       Christopher.Jackson5@usdoj.gov
       Matthew.Sullivan2@usdoj.gov
       Tel.: (202) 514-2000

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel, Mark Rollins, via the Electronic Case Filing (ECF) system, this 5th day of November, 2021.

                                                      /s/Matthew F. Sullivan
                                                      Matthew F. Sullivan
                                                      Trial Attorney
                                                      United States Department of Justice
                                                      Criminal Division, Fraud Section